FILED
United States Court of Appeals
Tenth Circuit

November 30, 2007

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DANIEL RAY GRAYSON,

Defendant-Appellant.

No. 07-7012

(D.C. No. CR-06-15-P)
(E. D. Oklahoma)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE** and **LUCERO,** Circuit Judges, and **BRIMMER**, District Judge.[**]

---

Defendant Daniel Grayson (Grayson) was convicted of conspiracy to possess with

intent to distribute narcotics, in violation of 21 U.S.C. § 846, and sentenced to a term of

imprisonment of 360 months. Grayson now appeals his conviction and sentence. We

exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

In 2004, agents with the Oklahoma State Bureau of Investigation (OSBI) learned

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**] The Honorable Clarence A. Brimmer, United States District Judge for the
District of Wyoming, sitting by designation.

that methamphetamine was being transported from Gainesville, Texas, to Ardmore, Oklahoma, for purposes of distribution. The ensuing investigation revealed the involvement of several individuals, including defendant Grayson, who lived at various times in both Gainesville and Ardmore, and who was known on the street by the nicknames "Pun" and "Big Pun." In April 2004, Grayson met with a Gainesville resident named Elijah Salazar, who was a member of a Chicago-based street gang called Satan's Disciples, and agreed to begin distributing methamphetamine and marijuana "fronted" to him by Salazar. Although Grayson had some difficulties in distributing marijuana, he quickly proved adept at distributing methamphetamine, progressing from distributing two ounces at a time to distributing up to a pound or more per week. Grayson's customers were primarily Ardmore residents who either used or resold the methamphetamine.

In early 2005, Grayson, who was continuing to obtain methamphetamine from Salazar for distribution, arranged for an individual named Cody Pierce to transport methamphetamine from Gainesville to Ardmore for distribution. Pierce initially began transporting an ounce of methamphetamine at a time, but progressed to larger quantities and, on approximately four occasions, transported half-pound quantities of methamphetamine. On June 12, 2005, Pierce was arrested by Texas law enforcement authorities while en route from Gainesville to Ardmore with a large quantity of methamphetamine.

On February 15, 2006, a federal grand jury returned an indictment charging Grayson and eight co-defendants, including Pierce, Salazar, and Salazar's own supplier,

Cody Shell, with conspiracy to possess with intent to distribute marijuana, methamphetamine and powder cocaine, in violation of 21 U.S.C. § 846. All eight of Grayson's co-defendants pled guilty. Grayson was tried alone on October 3-4, 2006. At the conclusion of the evidence, the jury found Grayson guilty of the conspiracy charge alleged in the indictment and further found, in response to a special interrogatory, that the amount of methamphetamine involved in the conspiracy was in excess of fifty grams.

A presentence investigation report (PSR) was subsequently prepared recommending a total offense level of 41, a criminal history category of IV, and a resulting guideline range of 360 months to life. Grayson filed no objections to the PSR. He did, however, move for a downward departure from the recommended guideline range pursuant to U.S.S.G. § 4A1.3, arguing that his criminal history category substantially overrepresented the seriousness of his criminal history or the likelihood that he would commit other crimes. Alternatively, Grayson argued that the district court "should vary from the guideline range in imposing sentencing" because his "criminal history [wa]s limited to non-violent offenses all but one of which [we]re misdemeanors," his "lack of guidance as a youth," and "the calculated guideline range . . . would result in a term of incarceration far in excess of sentences given to [his] co-defendants and co-conspirators." ROA, Vol. 1, Doc. 343 at 1.

On January 19, 2007, the district court adopted the calculations set forth in the PSR and sentenced Grayson to a term of imprisonment of 360 months, a sentence at the bottom of the guideline range. In doing so, the district court rejected Grayson's motion

3

for a downward departure or variance.

## II.

*Admission of photograph of tattoo*

In his first issue on appeal, Grayson contends the district court erred in allowing the government to introduce, during the trial testimony of OSBI special agent Bob Horn, a photograph of a tattoo on Grayson's back. The tattoo depicted in the photograph is comprised of two lines of text. The first line reads: "Pun A/K/A"; the second line reads: "the Punisher." According to Grayson, the photograph "served to unfairly prejudice the jury while having no probative value whatsoever." Aplt. Br. at 7. In particular, Grayson notes that "Horn was unable to determine when the tattoo was place[d] on [Grayson's] back," id., and admitted it "was possible that the purpose of the tattoo being placed on [Grayson] was to signify [his] being a fan of the rap artist, Big Pun," id. at 8.

"The admission of photographs into evidence is reviewed for an abuse of discretion." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006). The district court must, consistent with Federal Rule of Evidence 403, "balance the prejudicial effect of the photograph[] against [its] probative value, an exercise of discretion that is rarely disturbed." Id. (internal quotation marks omitted).

We reject Grayson's assertion that the photograph at issue lacked any probative value. Horn testified that it was normal practice for gang members and drug dealers to use nicknames, that Grayson used the nickname "Pun," and that "Pun" was short for "punisher." ROA, Vol. 3 at 130-31, 135. In turn, Elijah Salazar, Grayson's key supplier

4

and one of his charged co-conspirators, specifically referred to Grayson as "Big Pun" in his testimony at trial. Id. at 169. In light of this testimony, the photograph at issue was relevant for purposes of confirming that Grayson did, in fact, use the nickname "Pun," and that it was short for "punisher." The photograph also arguably helped to bolster the credibility of Salazar, who was a key witness against Grayson.

Grayson's assertions of unfair prejudice likewise lack merit. Although it is true that Horn did not know when Grayson had the tattoo placed on his back, and acknowledged that it was possible that the tattoo was intended as an homage to a rap artist, Grayson's trial counsel was able to elicit this information from Horn on cross-examination. In other words, Grayson had the opportunity to attempt to diminish the prejudicial effect of the photograph. Thus, we conclude the district court did not abuse its discretion in admitting the photograph.

Grayson also asserts, in passing, that he was prejudiced by the "cumulative effect" of the admission of the photograph and two allegedly improper questions posed by the prosecutor during trial. Aplt. Br. at 7. Because we have concluded there was no error on the part of the district court in admitting the photograph, Grayson's cumulative error argument must fail. See United States v. Caballero, 277 F.3d 1235, 1249 (10th Cir. 2002) ("Cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.") (internal quotation marks omitted).

*Sufficiency of evidence*

Grayson contends that the evidence presented at trial was insufficient to support

5

his conspiracy conviction. We review sufficiency of the evidence claims de novo, asking only whether, considering the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt. United States v. Robinson, 435 F.3d 1244, 1250 (10th Cir. 2006).

To establish the existence of the alleged conspiracy under 21 U.S.C. § 846, the government was required to prove that (1) Grayson and at least one other person agreed to violate the law, (2) Grayson knew at least the essential objectives of the conspiracy, (3) he knowingly and voluntarily became part of the conspiracy, and (4) the alleged co-conspirators were interdependent. See United States v. Ivy, 83 F.3d 1266, 1285 (10th Cir. 1996) (citation and internal quotation marks omitted). A jury is permitted to infer an agreement "from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose." United States v. Johnson, 42 F.3d 1312, 1319 (10th Cir. 1994). "A jury may presume a defendant is a knowing participant in the conspiracy when he or she acts in furtherance of the objective of the conspiracy." United States v. Carter, 130 F.3d 1432, 1440 (10th Cir.1997). Interdependence is established when "each coconspirator's activities constitute essential and integral steps toward the realization of a common, illicit goal." Id.

Notably, Grayson does not specifically challenge the evidentiary support for any of the four essential elements of the crime of conviction. Instead, he argues generally that the government's evidence against him was insufficient because it consisted exclusively

of "testimony by biased and motivated persons who [we]re either convicted co-conspirators or their associates," Aplt. Br. at 7-8, and who were "motivated by the fear of being indicted or the fear of receiving a maximum sentence upon conviction." Id. at 11. He also notes that these same witnesses "were all associated with the drug trade or gang culture," and "[s]everal of [them] admitted to habitually lying or were caught lying during their testimony." Id. Grayson also notes that "[n]one of the witnesses ever conducted a controlled transaction with [him]," id., "[n]o search warrant was ever sought or executed on [his] home," id., and "[n]o wire taps were ever sought for the interception of any of [his] phone calls." Id. at 11-12. Finally, he asserts that all of the witnesses against him "agreed that [he] was an alcoholic who was wholly unreliable." Id. at 11.

It is true that most of the government's witnesses were charged or uncharged co-conspirators who had either pled guilty and were seeking to reduce their sentences or were seeking to avoid prosecution. It is also true that some of the government witnesses admitted to having lied on previous occasions. Those facts, however, simply go to their credibility, a matter which we do not evaluate in determining the sufficiency of the evidence. United States v. Avery, 295 F.3d 1158, 1177 (10th Cir. 2002). As for Grayson's arguments regarding the types of evidence the government failed to present (e.g., evidence of controlled purchases from him, wire tap evidence), that simply goes to the weight of the evidence, another matter that we do not consider in determining the sufficiency of the evidence. United States v. Norman, 388 F.3d 1337, 1340 (10th Cir. 2004).

7

Having rejected Grayson's general arguments, we have also, out of an abundance of caution, examined the trial transcript. That examination firmly persuades us that the government's evidence was more than sufficient to establish each of the four essential elements of the charged conspiracy. Elijah Salazar testified at trial that he met with Grayson in April 2004 and they agreed that Grayson would begin distributing methamphetamine and marijuana provided by Salazar. Salazar further testified that, following this meeting, he began fronting Grayson small amounts of both types of drugs, and that Grayson was particularly successful in distributing methamphetamine. Salazar testified that their business relationship progressed to the point where he was providing Grayson with up to a pound of methamphetamine per week for distribution. Several of Grayson's other charged co-conspirators also testified against him. Cody Shell testified that he was Salazar's supplier of methamphetamine and observed Salazar in turn distributing the methamphetamine to Grayson. Sara Brule, Salazar's live-in girlfriend, confirmed that Shell was Salazar's supplier and that Grayson was one of Salazar's primary customers for methamphetamine. Cody Pierce testified that he purchased methamphetamine from Grayson on a regular basis for his own personal consumption and for redistribution. Pierce further testified that in late winter or spring of 2005, he began transporting quantities of methamphetamine from Grayson in Gainesville to an individual in Ardmore named Matt Horn. In addition to these co-conspirators, other witnesses confirmed either purchasing methamphetamine from Grayson or observing him distribute methamphetamine. In sum, this evidence was sufficient to have allowed the jury to

8

reasonably find that Grayson conspired with Shell, Salazar, Pierce, and others to distribute substantial quantities of methamphetamine in Gainesville and Ardmore.

*District court's refusal to depart downward*

In his final argument on appeal, Grayson asserts generally that the 360-month sentence imposed by the district court was greater than necessary to comply with the statutory directives of 18 U.S.C. § 3553(a). Although he concedes that the district court correctly calculated his guideline range, he argues that the district court should have departed downward from the guideline range "for the reason that this sentencing range result[ed] from a criminal history category which grossly over-represent[ed] [his] criminal history." Aplt. Br. at 18. In support of this argument, Grayson notes that he "has only one felony conviction" (for driving under the influence of alcohol) and he asserts that this conviction and his various misdemeanor convictions "reflect[] his long struggle with alcohol and other substance abuse." Id. Grayson also asserts that he "lack[ed] . . . guidance as a youth . . . ." Id. at 19. Lastly, Grayson asserts that "[o]ther defendants in the present case, including those who played a larger role in the conspiracy . . . , have been sentenced to terms of incarceration far below [his own] Guideline calculation . . . ." Id.

Although Grayson couches many of his arguments in terms of the district court's failure to "depart downward" from the guideline range, we lack jurisdiction to review a sentencing court's refusal to depart downward, absent a clear misunderstanding by the court of its discretion to depart. United States v. Chavez-Diaz, 444 F.3d 1223, 1228 (10th

9

Cir. 2006).  Because that exception clearly does not apply in this case[1], we will assume that Grayson is intending to argue that the district court erred in refusing to impose a below-guideline sentence (a variance), and that the sentence actually imposed was unreasonable.

We review the sentence imposed by the district court for reasonableness in light of the sentencing factors set forth in 18 U.S.C. § 3553(a).  United States v. Kristl, 437 F.3d 1050, 1053 (10th Cir. 2006).  A district court has significant discretion in sentencing, and our review for reasonableness, regardless of whether the sentence falls inside or outside of the advisory guidelines, is a review for abuse of discretion.  Rita v. United States, 127 S.Ct. 2456, 2465 (2007).  Where, as here, the sentence imposed by the district court falls within the advisory guideline range, we apply an appellate presumption of reasonableness.  United States v. Geiner, 498 F.3d 1104, 1107 (10th Cir. 2007); see Rita, 126 S.Ct. at 2464 (approving of the application of an appellate presumption of reasonableness to a within-guideline sentence).  "Th[is] presumption simply reflects the increased likelihood that a Guidelines sentence will be reasonable because it represents the combined judgment of the sentencing court and the Sentencing Commission." Geiner, 498 F.3d at 1108.

Nothing in the record or in Grayson's appellate pleadings indicates that the district

---

[1] At the sentencing hearing in this case, the district court stated: "I recognize my authority to depart from the advisory sentencing range called for by application of the guidelines."  ROA, Vol. 5 at 14.

court abused its discretion in refusing to impose a below-guideline sentence.[2]  In other words, nothing in the record remotely suggests that the within-guideline sentence imposed by the district court was unreasonable.  To begin with, although Grayson asserts that his criminal history category overrepresented the seriousness of his criminal history or the likelihood that he would commit other crimes, that is not borne out by the record.  According to the PSR (which Grayson did not object to), Grayson's adult criminal career began in October 1998 when, at age nineteen, he pled guilty in Oklahoma state court to malicious injury to property.  He thereafter incurred criminal convictions in January 2002 (at age twenty-two), July 2003 (at age twenty-four), November 2004 (at age twenty-five), twice in December 2004 (also at age twenty-five), and January 2005 (at age twenty-five).  This pattern clearly suggests that Grayson's criminal activity was increasing as he aged, and it also clearly indicates that Grayson was engaging in a variety of criminal activity during the same time period (2004-05) that he was engaged in the drug conspiracy of which he was found guilty.  Moreover, although it is true, as asserted by Grayson, that many of his convictions appear to have stemmed from his abuse of alcohol, that is not sufficient to counter the frequency and recency of these convictions.  Indeed, as the government asserted in its response to Grayson's motion for downward departure, there

_____

[2] The sentence is clearly reasonable from a procedural standpoint because, in pertinent part, the district court expressly considered and rejected the reasons cited by Grayson in support of his request for a below-guideline sentence.  ROA, Vol. 5 at 14 ("I have considered the factors submitted on behalf of the defendant and cannot find that as to each or by any combination thereof that there exists mitigating circumstances which would warrant . . . a sentencing variance from the advisory range.").

11

was substantial reason to believe that confinement was the only thing that would keep Grayson from abusing alcohol and engaging in additional, and more serious, criminal conduct.

The remaining two factors cited by Grayson are likewise insufficient to justify a below-guideline sentence. Although Grayson points to his "lack of guidance as a youth," nothing in the PSR (or in Grayson's own pleadings) suggests that this factor was so unusual or extreme as to justify or otherwise explain Grayson's serious criminal behavior, and thus does not render the within-guideline sentence imposed by the district court an abuse of discretion.[3] Likewise, the purported disparity in sentences between Grayson and his co-defendants does not render the sentence imposed by the district court unreasonable. As the government pointed out in its response to Grayson's motion for downward departure, "[e]ach of the other defendants [in this case] accepted responsibility for their actions and entered guilty pleas," and "[m]any of them provided substantial assistance in the investigation and trial of this case." ROA, Vol. 1, Doc. 349 at 2. Although Grayson "had the same opportunities," he "chose not to take advantage of them" and "should not now benefit from this failure." Id.; see United States v. Davis, 437 F.3d 989, 997 (10th Cir. 2006) (rejecting similar disparity argument).

---

[3] According to the PSR, Grayson's parents divorced when he was age six. ROA, Vol. 6, PSR at 11. From age six to age twelve, Grayson was raised by friends of his family. Id. At age twelve, he was placed in the Cal Farley's Boy's Ranch near Amarillo, Texas, where he remained until age sixteen. Id. Thereafter, Grayson lived with his father until adulthood. Id.

The judgment of the district court is AFFIRMED.

Entered for the Court


Mary Beck Briscoe
Circuit Judge